UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KENMAR SECURITIES, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>UFINET LATAM, S.L.U., a Sociedad Limitada Unipersonal of Spain, JUAN CARLOS MENÉNDEZ ROMERO, an individual, and GASTÓN MENÉNDEZ ROMERO, an individual,<br><br>Defendants. | Civil Action No. 1:25-cv-00586<br><br><br>**COMPLAINT** |

Plaintiff Kenmar Securities, LLC ("Plaintiff" or "KENMAR"), by its undersigned attorneys, as and for its Complaint against Defendants UFINET LATAM, S.L.U., a Sociedad Limitada Unipersonal of Spain ("UFINET Latam"), JUAN CARLOS MENÉNDEZ ROMERO ("J. Menéndez"), and GASTÓN MENÉNDEZ ROMERO ("G. Menéndez" and together with J. Menéndez, the "Individual Defendants," and altogether with UFINET Latam, the "Defendants"), requests an Order and Judgment holding UFINET Latam and the Individual Defendants jointly and severally liable for the damages alleged herein, and alleges as follows on the basis of knowledge with respect to itself and its own actions, and on the basis of knowledge and information and belief as to all other matters:

**NATURE OF THE CASE**

1.    This is an action to find UFINET Latam and the Individual Defendants jointly and severally liable for the amounts awarded to Plaintiff in a Final Arbitration

Award, issued on August 1, 2024 (the "Final Award")[1] by the International Centre for Dispute Resolution ("ICDR") of the American Arbitration Association ("AAA"), against NEGOCIOS Y TELEFONIA NEDETEL S.A. ("NEDETEL"), a sociedad anonima organized under the laws of Ecuador.

2.    KENMAR commenced the arbitration by issued timely notice and demand to NEDETEL and the Defendants.

3.    Although Defendants refused to participate in the Arbitration, J. Menendez submitted written testimony and testified at the hearing.

4.    After a weeklong hearing held in New York City and post-hearing briefing, the arbitrator (the "Arbitrator") issued the Final Award. The Arbitrator found that NEDETEL had breached its obligations under an Advisory Agreement to pay KENMAR certain Success Fees (each a "Success Fee" and together, as more fully described below, the "Success Fees").

5.    The Arbitrator found that the Success Fees became due and owing as a result of UFINET Latam's October 1, 2021 closing of the stock purchase agreement (the "SPA") for 70% of the Individual Defendants' equity of NEDETEL and in connection with a December 18, 2023 (the "December 18, 2023 Transaction") partial exercise of a put/call option agreement among the Defendants (the "Put/Call Option Agreement").

6.    The Arbitrator awarded KENMAR money damages, interest, fees, expenses, and interest amounting to approximately $5,000,000 and granted

---

[1] A copy of the Final Award, redacted for confidentiality, is annexed hereto as **Exhibit 1**.

declaratory relief finding that NEDETEL is obligated to pay a third Success Fee upon the final transaction contemplated in the Put/Call Option Agreement.

7. Without objection by NEDETEL to the merits of the Arbitrator's findings, the Final Award was substantially confirmed by the District Court for the Southern District of New York on December 19, 2024.

8. Judgment against NEDETEL was entered on December 19, 2024 in the District Court for the Southern District of New York.

9. Despite NEDETEL's failure to object to the Arbitrator's findings in the Final Award and timely demands for payment, NEDETEL has refused to satisfy the Final Award and the Judgment.

10. KENMAR alleges the Defendants are jointly and severally liable for the relief awarded in the Final Award under the theories of alter ego, fraudulent conveyance, and successor liability.

11. Accordingly, KENMAR is entitled to an Order and Judgment enforcing the Final Award as against UFINET Latam and the Individual Defendants.

## PARTIES

12. Plaintiff KENMAR is a Delaware limited liability company, with a principal place of business located in New York County in the State of New York. KENMAR is a registered broker dealer and member of FINRA. The only member of KENMAR is Kenmar Olympia, LLC, a limited liability company, which is owned by Black Dome Partners, LLC ("Black Dome"), and R. Carlen Advisory Partners, Inc. ("R. Carlen"). Black Dome is a limited liability company owned by two individuals,

3

each of whom is domiciled in New York. R. Carlen is a corporation whose principal place of business is in New York.

13. On information and belief, UFINET Latam is a Sociedad Limitada Unipersonal organized under the laws of Spain with a principal place of business located in Madrid, Spain.

14. On information and belief, J. Menéndez is an individual residing in Guayaquil, Ecuador. At all relevant times, J. Menéndez has been a minority shareholder of NEDETEL. Before the disputed transaction, J. Menéndez served as the President of NEDETEL. J. Menéndez is currently the President of the Board of Directors of, and commercial advisor to, the post-merger NEDETEL.

15. On information and belief, G. Menéndez is an individual residing in Guayaquil, Ecuador. Before the disputed transaction, G. Menéndez was the majority shareholder of NEDETEL. Following the transaction between NEDETEL and Defendants, G. Menéndez continues to hold a minority equity interest in NEDETEL.

16. NEDETEL is a Sociedad Anónima organized under the laws of Ecuador. In connection with the transactions described herein, UFINET Latam's pre-existing affiliates, Ufinet Ecuador UFIEC S.A. and Broadband Comunicaciones S.A. (together, the "Pre-existing UFINET Affiliates"), were merged with and into NEDETEL with the executives of UFINET Latam assuming majority control over the surviving entity.

## JURISDICTION AND VENUE

**This Court has subject matter jurisdiction over this dispute.**

17.    This Court has subject matter jurisdiction over this action pursuant to 9 U.S.C. §§ 202, 203, & 301 because the relevant arbitration agreement arose out of a commercial legal relationship between a citizen of the United States and a citizen of Ecuador, contemplated performance abroad, and has a reasonable relationship to Ecuador.

18.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between Plaintiff and Defendants and the amount in controversy exceeds $75,000 (exclusive of interest and costs).

**This Court has personal jurisdiction over the Individual Defendants.**

19.    Personal jurisdiction in New York is appropriate because the Advisory Agreement provides that "Advisor and Company consent to the jurisdiction and venue of "any" "court of competent jurisdiction in the State of New York." The agreement to seat the arbitration in New York provides for personal jurisdiction in New York for the purpose of enforcement. *See Doctor's Associates, Inc. v. Stuart, 85 F.3d 975, 983 (2d Cir. 1996)* ("A party who agrees to arbitrate in a particular jurisdiction consents . . . to personal jurisdiction . . . within that jurisdiction.").

20.    New York law applies because the Advisory Agreement provides that: "This Advisory Agreement and all actions relating to it or arising out of any of its terms, or the breach or enforcement of its terms shall be governed by the laws of the State of New York, without giving effect to the principles of conflict of laws. . . ."

21.    Each of the Individual Defendants is estopped from denying applicability of the choice of law and personal jurisdiction provisions of the Advisory Agreement pursuant to the direct benefits doctrine. *Am. Bur. of Shipping v Tencara Shipyard S.P.A.,* 170 F3d 349, 353 (2nd Cir. 1999) ("A party is estopped from denying its obligation to arbitrate when it receives a "direct benefit" from a contract containing an arbitration clause.")

22.    As set forth more fully below, the Individual Defendants exploited the direct benefit of the Advisory Agreement by using KENMAR's status as a New York-based international investment bank to open a channel of communication with CINVEN Limited ("CINVEN"), the majority owner of UFINET Latam, for the sale of their equity in NEDETEL.

23.    KENMAR's contacts with CINVEN resulted in an expression of interest by UFINET Latam that ultimately led to the direct benefit to the Individual Defendants of a sale of their equity.

24.    Each of the Individual Defendants are also bound by the choice of law and personal jurisdiction provisions of the Advisory Agreement pursuant to the "closely related" doctrine. *See, e.g., Aguas Lenders Recovery Grp. v. Sues, S.A.,* 585 F.3d 696, 701 (2d Cir. 2009).

25.    J. Menéndez signed the Advisory Agreement in his capacity as President of NEDETEL and, therefore, acted in the capacity of a legal representative of NEDETEL.

6

26.     G. Menéndez received a copy of the Advisory Agreement and, on information and belief, authorized the execution of the Advisory Agreement as the 70% shareholder of NEDETEL.

27.     The Advisory Agreement states that it "shall be binding upon and shall inure to the benefit of each of the parties hereto and their respective legal representatives, successors and assigns."

28.     Both Individual Defendants signed the letter terminating the Advisory Agreement days before executing the SPA with UFINET Latam.

29.     Accordingly, the Individual Defendants are sufficiently "closely related" to the Advisory Agreement such that it was foreseeable that the choice of law and personal jurisdiction provisions of the agreement would be binding upon them. *See*, *e.g.*, *Aguas Lenders Recovery Grp.*, 585 F.3d at 701 ("[T]he fact a party is a non-signatory to an agreement is insufficient, standing alone, to preclude enforcement of a forum selection clause"); *Affiliated FM Ins. Co. v. Kuehne + Nagel, Inc.*, 328 F. Supp. 3d 329, 336 (S.D.N.Y. 2018) ("Non-signatory alter-egos, corporate executive officers, and successors-in-interest have all, at least in some instances, satisfied the 'closely related" test.').

30.     The exercise of personal jurisdiction over the Individual Defendants comports with the requirements of due process because, as set forth more fully below, the Individual Defendants sought out and engaged a New York-based international investment banking firm, KENMAR, for the purpose of opening a channel of communication with UFINET Latam that was otherwise unavailable to them.

**This Court has personal jurisdiction over UFINET Latam.**

31.    The choice of law and personal jurisdiction provisions of the Advisory Agreement are binding upon UFINET Latam under the doctrine of successor liability. *See Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d at 701 ("if successorship is established, a non-signatory is subject to the . . . presumption of the enforceability of mandatory forum selection clauses"); *KTV Media Int'l, Inc. v. Galaxy Grp., LA LLC*, 812 F. Supp. 2d 377, 386 (S.D.N.Y. 2011); *Elec. Mobile Cars, LLC*, 2012 WL 5264454, at *1.

32.    Pursuant to the theory of veil-piercing/alter ego, a non-signatory may be bound by forum selection and consent to jurisdiction clauses as a successor-in-interest to the acquired corporation where the non-signatory exercises complete dominion over the acquired corporation and has used and is continuing to use this dominion to commit a fraud or wrong. *See, e.g., Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997); *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 386 F. Supp. 2d 461, 476 (S.D.N.Y. 2005) (holding that the "diversion of funds before a claim is made but after a defendant has notice of a potential claim can constitute a wrong for the purposes of piercing the corporate veil"); *Alishaev Bros. Inc. v. LA Girl Jewelry Inc.*, No. 17CV7505 (JGK), 2020 WL 1489841, at *9 (S.D.N.Y. Mar. 27, 2020), *objections overruled,* No. 17-CV-7505 (JGK), 2020 WL 2115175 (S.D.N.Y. May 4, 2020). *See also CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 316 F. Supp. 3d 635, 646 (S.D.N.Y. 2018)

33.    As discussed more fully below, UFINET Latam dominates NEDETEL by way of its majority board control, control over the day-to-day management of

NEDETEL, and exercise of the power to transfer cash and liquid assets out of NEDETEL to UFINET Latam and its affiliates.

34.    UFINET Latam has used and is continuing to use its domination and control over NEDETEL to hinder and delay payment of the Final Award while transferring approximately $10,000,000 of cash and/or liquid assets out of NEDETEL.

35.    It was foreseeable that the choice of law and forum-selection provisions of the Advisory Agreement would be enforced against UFINET Latam because, as set forth more fully below, UFINET Latam engaged in secret process to purchase NEDETEL knowing or under circumstances where it should have known that KENMAR had been retained as advisor to NEDETEL.

**Venue is proper in this district.**

36.    Venue is proper in this district because the parties consented, in the Advisory Agreement, to the jurisdiction and venue of the courts of the State of New York.

37.    Venue is also otherwise proper in this district in accordance with 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## BACKGROUND FACTS

### NEDETEL and the Individual Defendants failed to achieve a transaction through local advisors.

38.    In or around April 2019, the Individual Defendants retained an investment banking advisor based in Santiago, Chile (the "Prior Advisor") to commence a process to sell NEDETEL (the "2019-2020 Sale Process").

39.    During the 2019-2020 Sale Process, NEDETEL entered into discussions with a potential acquirer located in Chile, but the Chilean-based potential acquirer backed out.

40.    NEDETEL then approached UFINET Latam, but UFINET Latam informed the Individual Defendants and their Prior Advisor that its acquisitions department was closed to NEDETEL, and the 2019-2020 Sale Process terminated in or around July 2020.

### NEDETEL and the Individual Defendants retained KENMAR, a New York-based international investment bank, for the specific purpose of reaching potential acquirers otherwise unavailable to NEDETEL.

41.    After the prior process concluded, the Individual Defendants conceived a plan to retain a New York-based international investment bank to sell NEDETEL.

42.    On information and belief, the Individual Defendants believed that an New York-based international investment bank would open connections with and generate interest from potential acquirers otherwise not available to NEDETEL or its Prior Advisor.

43.    An advisor to the Individual Defendants identified KENMAR as a New York-based international investment bank suitable for the Individual Defendants' purposes.

44.    In early August 2020, the Individual Defendants began discussions with KENMAR regarding a retention by NEDETEL for investment banking services.

45.    On August 22, 2020, the Individual Defendants met face-to-face with Daniel Polizzi, Managing Director of KENMAR.

46.    After these discussions, KENMAR sent the Advisory Agreement to the Individual Defendants.

47.    Section I of the Advisory Agreement provides that KENMAR shall "represent and promote [NEDETEL] to potential acquirers ('Potential Acquirer(s)') in connection with development and pursuit of one or more transactions . . ."

48.    In Section VI of the Advisory Agreement, NEDETEL agrees that a Success Fee would be due for any "Transaction" that is "consummate[ed]" or "enter[ed]" into within "twenty-four (24) months after termination."

49.    In Section II of the Advisory Agreement, NEDETEL agrees to pay KENMAR an "Advisory Fee and Commission," the amount of which is defined in Exhibit A to the agreement. Exhibit A to the agreement defined the Advisory Fee and Commission as including a "Retainer Fee" and a "Success Fee" payable upon "closing of each Transaction" without any other conditions or criteria. Advisory Agreement § II and Ex. A.

50.    In Section XI.G. of the Advisory Agreement, NEDETEL agrees to pay KENMAR a "success fee on the same terms and conditions as described in Exhibit A" "in the event a Potential Acquirer (or any other entity organized by the Potential Acquirers) invests in any project directly or indirectly sponsored by the Company or any other entity organized by the Company, in each case within the five (5) year period following the termination of this Advisory Agreement."

51.    G. Menéndez received a copy of the Advisory Agreement in and around August 2020 and, in his capacity as 70% majority owner of NEDETEL, authorized and directed J. Menéndez to enter into the Advisory Agreement on behalf of NEDETEL.

52.    On or about September 2, 2020, J. Menéndez executed the Advisory Agreement in his capacity as President of NEDETEL.

### UFINET Latam knew of KENMAR's
### role as advisor to NEDETEL.

53.    In connection with its role as advisor to NEDETEL, KENMAR commenced a sale process.

54.    Among other things, KENMAR prepared a confidential information memorandum (the "CIM") regarding NEDETEL, identified numerous potential acquirers ("Potential Acquirers") for a transaction with NEDETEL, and identified the most effective way to approach these Potential Acquirers.

55.    KENMAR's list of Potential Acquirers included UFINET Latam and identified contacts at CINVEN as mostly likely to generate interest at UFINET Latam in a potential transaction with NEDETEL.

56. CINVEN is the private equity firm that owns the majority of UFINET Latam.

57. By mid-December, KENMAR had received interest from several Potential Acquirers and one non-binding offer.

58. On or about December 17, 2020, the Individual Defendants authorized KENMAR to contact CINVEN regarding a potential transaction between UFINET Latam and NEDETEL.

59. On the same day, December 17, 2020, KENMAR made initial contact with representatives of CINVEN regarding a potential transaction between UFINET Latam and NEDETEL and forwarded a copy of the CIM.

60. KENMAR sent subsequent communications to CINVEN and, on January 15, 2021, CINVEN indicated they would review the materials provided and get back to KENMAR.

### Defendants engaged in a secret sale process.

61. On or about January 19, 2021, only a few days after KENMAR's last contact with CINVEN, representatives of UFINET Latam contacted representatives of the Individual Defendants about a potential transaction with NEDETEL.

62. On information and belief, during the period between December 17, 2020 and January 19, 2021, CINVEN advised one or more executives of UFINET Latam of KENMAR's contact and directed UFINET Latam to reach out to the Individual Defendants regarding a potential transaction with NEDETEL.

63. On information and belief, UFINET Latam knew or should have known of KENMAR's status as advisor to NEDETEL by way of communications with and information conveyed from CINVEN.

64. After UFINET Latam contacted the Individual Defendants on January 19, 2021, the Individual Defendants immediately directed KENMAR to cease further communications with UFINET Latam.

65. NEDETEL and UFINET Latam then engaged in a secret sale process regarding a possible transaction.

66. Despite having knowledge of KENMAR's role as advisor to NEDETEL, the Defendants excluded KENMAR from the secret sale process.

67. The Individual Defendants took affirmative steps to conceal the sale process from KENMAR, including by pretending to entertain other offers obtained through KENMAR's efforts and participating in discussions with other Potential Acquirers identified by KENMAR.

68. On information and belief, the Individual Defendants used the other offers procured by KENMAR as leverage in their negotiations with UFINET Latam.

69. On or about July 14, 2021, the Individual Defendants entered an agreement-in-principle for the sale of 70% of the equity of NEDETEL to UFINET Latam.

70. The agreement in principle between Defendants was conditioned upon the approval of CINVEN, majority owner of UFINET Latam.

14

71. CINVEN knew of and approved the agreement in principle between Defendants.

72. Defendants failed to disclose the agreement-in-principle to KENMAR.

73. On or about July 29, 2021, the Individual Defendants signed a letter terminating the Advisory Agreement with KENMAR (the "Termination Letter").

74. In the Termination Letter, NEDETEL expressly acknowledged that representatives of KENMAR had "invested" "hard work" towards the project.

75. By way of the foregoing communications and the other facts alleged herein, CINVEN knew that KENMAR was acting as advisor to NEDETEL and CINVEN's knowledge was imputed to UFINET Latam.

**UFINET Latam and NEDETEL completed a Transaction.**

76. On or about August 4, 2021, the Defendants and NEDETEL signed the SPA for the purchase and sale of 70% of the equity of NEDETEL to UFINET Latam.

77. The SPA also provided for the execution at closing of a shareholders' agreement (the "Shareholders' Agreement") providing for the Put/Call Option Agreement for UFINET Latam to acquire the remaining 30% of the equity of NEDETEL on specified terms.

78. By the SPA, Shareholders' Agreement, and other, related agreements, the Defendants and NEDETEL agreed that, among other things:

    a. UFINET Latam would acquire 70% of the equity of NEDETEL, with option rights to acquire the remaining equity;

    b. The Individual Defendants would receive a portion of the equity of the Pre-Existing UFINET Affiliates.

15

c. The Pre-Existing UFINET Affiliates would be merged with and into NEDETEL;

d. Upon the closing, UFINET Latam would obtain majority control over the board of directors of NEDETEL with J. Menéndez remaining on as President of the Board;

e. UFINET Latam's existing Ecuador-based management and operational teams would assume control over the post-merger NEDETEL's day-to-day operations;

f. J. Menéndez would be retained as commercial advisor for the purpose of transferring his trade secrets and commercial information to the UFINET Latam management team;

g. UFINET Latam would be granted the power to transfer all of NEDETEL's cash and liquid assets out of NEDETEL to UFINET Latam or its global affiliates; and

h. the Individual Defendants would retain certain veto powers over the payment of any pre-closing liabilities of NEDETEL.

79. Defendants failed to disclose the SPA to KENMAR.

80. The transaction described in the SPA closed in and around October 18, 2021.

81. On or about October 19, 2021, UFINET Latam issued a public statement regarding the transaction with NEDETEL. Among other things, the statement revealed that "UFINET, the largest fiber-optic infrastructure wholesale operator in

16

Latin America, has just signed a corporate agreement to incorporate NEDETEL's operations into UFINET's business in Ecuador, thus strengthening the wholesale offer in the country."[2] NEDETEL's own website refers to itself as "Ufinet Nedetel" and includes a link to the code of ethics of "Ufinet Group."[3]

82.    The foregoing constituted a "Transaction" (as defined in the Advisory Agreement and referred to here as the "SPA Transaction") triggering NEDETEL's obligation to pay a Success Fee under Sections II and VI(b)(i) and (ii) of the Advisory Agreement.

**KENMAR attempted to resolve the dispute without litigation.**

83.    Upon learning of the SPA Transaction, KENMAR timely made a demand for full payment of the Success Fee due pursuant to the Advisory Agreement.

84.    On November 16, 2021, counsel for KENMAR notified NEDETEL that it was in breach of the Advisory Agreement for failing to pay the Success Fee.

85.    On or about November 24, 2021, a representative of KENMAR notified UFINET Latam of the refusal by NEDETEL to pay the Success Fee lawfully due under the Advisory Agreement.

86.    During a call between representatives of KENMAR and UFINET Latam, the representative from UFINET Latam confirmed that it had completed its acquisition of NEDETEL.

87.    On December 3, 2021, counsel for NEDETEL responded to KENMAR's notices but again refused to pay the Success Fee.

---

[2] https://www.ufinet.com/nedetel-and-ufinet-consolidate-their-position-in-ecuador/. (accessed on July 18, 2023).
[3] http://nedetel.com. (accessed on July 18, 2023).

88.    On December 8, 2021, KENMAR, through counsel, again demanded payment of the Success Fee.

89.    Defendants refused to pay the Success Fee due under the Advisory Agreement.

90.    On information and belief, the Individual Defendants intentionally prevented NEDETEL from paying the Success Fee owed under the Advisory Agreement so that they could reap personal economic benefits from the SPA Transaction, including the realization of greater consideration and/or proceeds from the SPA Transaction than what would have otherwise been realized if the Success Fee had been paid to KENMAR.

91.    On information and belief, UFINET Latam, acting with intent, used its domination and control over NEDETEL to hinder, delay, and prevent it from paying the Success Fee owed under the Advisory Agreement so that UFINET Latam or the Individual Defendants could transfer cash and/or other liquid assets out of NEDETEL to UFINET Latam or its global affiliates.

92.    On information and belief, beginning in or around December 2021 and continuing through 2022, UFINET Latam has transferred approximately $10,000,000 in cash and/or liquid assets out of NEDETEL.

**Defendants waived their right to arbitrate claims
arising under or related to the Advisory Agreement.**

93.    On November 30, 2022, KENMAR filed a Demand for Arbitration with the ICDR against NEDETEL, UFINET Telecom S.A.U.,[4] and the Individual Defendants (the "Arbitration").

94.    NEDETEL appeared in the Arbitration by Bradley S. Pensyl of Allen & Overy LLP.[5]

95.    Mr. Pensyl gave further notice that he also represented UFINET Latam and the Individual Defendants but declined to appear on their behalf in the Arbitration.

96.    On February 13, 2023, Mr. Pensyl informed counsel for KENMAR that UFINET Latam and the Individual Defendants would not agree to participate in the Arbitration on the grounds that they are non-signatories.

97.    Mr. Pensyl also made the assertion that "Ufinet Telecom S.A.U., which is included in KENMAR's Statement of Claim, is not affiliated with Ufinet Latam or Nedetel."

98.    By letters dated February 13, 2023 and February 14, 2024, Mr. Pensyl gave notice of Defendants' refusal to participate in the Arbitration.

---

[4] At the time, KENMAR reasonably believed that UFINET Telecom S.L.U. was the party who acquired NEDETEL. After commencement of the arbitration, KENMAR discovered information suggesting that in or around 2022 UFINET Telecom S.L.U. entered a sale and reorganization where its Spanish operations were divested and sold to a non-party and ultimately renamed to Lyntia Networks SA. CINVEN retained ownership of what was formerly UFINET Telecom S.L.U.'s international operations, which are now owned and operated by its majority owned subsidiary, UFINET Latam.

[5] Allen & Overy LLP was dissolved on April 30, 2024 and the firm merged with Shearman & Sterling forming A&O Shearman

99.    During an administrative call before the AAA ICDR and counsel for all parties, Mr. Pensyl again asserted the position that the Defendants' refused to participate in the Arbitration.

100.    On February 22, 2023, KENMAR filed its First Amended Statement of Claim adding UFINET Latam as a respondent.[6]

101.    Defendants again gave notice of their refusal to participate in the Arbitration.

102.    On March 29, 2023, the ICDR informed KENMAR and NEDETEL that it had made an "administrative determination" that without an agreement by the parties or a court order, it would proceed with the Arbitration only against NEDETEL and UFINET Telecom, S.A.U. as parties.

103.    Stephanie Cohen was appointed as the Arbitrator on April 5, 2023.

104.    By letter dated April 26, 2023, Arbitrator Cohen acknowledged the representation by Allen & Overy LLP that it represented all of the Defendants and Defendants' objection and refusal to participation in the arbitration.

105.    On May 3, 2023, Plaintiff commenced an action to compel Defendants to arbitrate all claims arising from or related to the claims asserted in the Arbitration.

106.    Pursuant to the individual practice rules of the Hon. Victor Marrero, the parties exchanged pre-motion letters regarding a contemplated motion to dismiss by Defendants.

---

[6] By letter dated July 18, 2023, KENMAR withdrew its claims against UFINET Telecom S.A.U. without prejudice.

107.    By letter dated July 11, 2023, Defendants asserted that they were not bound by the arbitration provision of the Advisory Agreement.

108.    Specifically, Defendants disputed that any of the doctrines of agency, direct benefit estoppel, successor-in-interest, and/or de factor merger applied to compel Defendants to arbitrate under the Advisory Agreement.

109.    On December 22, 2023, Plaintiff filed a Second Amended Petition to compel Defendants to arbitrate.

110.    By letter dated January 4, 2024, Defendants again asserted that they were not bound to arbitrate and objected to the invocation of any of the theories asserted by Plaintiff that operate to compel nonsignatories to arbitrate.

111.    But for Defendants refusal to participate in the Arbitration, KENMAR's claims against Defendants would have been submitted to the Arbitrator for hearing and determination.

112.    The Defendants' actions constitute a knowing and willful waiver of their right to arbitrate any disputes arising under or relating to the Advisory Agreement.

### Exercise of the Put/Call Option Agreement.

113.    On December 18, 2023, the Individual Defendants exercised their rights under the Put/Call Option Agreement to sell a portion of their remaining equity in the post-merger NEDETEL to UFINET Latam (*i.e.*, the December 18, 2023 Transaction), an event which triggered the obligation to pay a second Success Fee under Sections II and VI(b)(i) and (ii) of the Advisory Agreement.

114. Beginning on January 8, 2024 and continuing through January 11, 2024, KENMAR and NEDETEL conducted an Arbitration hearing before Arbitrator Cohen.

115. At the hearing, Daniel Polizzi testified on behalf of KENMAR. J. Menéndez and Ricardo Menéndez Romero testified on behalf of NEDETEL.

**The Final Award.**

116. On June 10, 2024, Arbitrator Cohen issued a Partial Final Award (the "Partial Final Award") finding that NEDETEL had breached its obligation to pay the Success Fees due under the Advisory Agreement, awarding money damages and interest to KENMAR and against NEDETEL, and granting declaratory relief to KENMAR finding that NEDETEL continues to be obligated to pay a third Success Fee upon the final exercise of the Put/Call Option Agreement for the sale of the Individual Defendants' remaining equity of NEDETEL.

117. On August 1, 2024, Arbitrator Cohen issued the Final Award incorporating the entirety of the Partial Final Award and awarding KENMAR attorneys' fees, costs of the arbitration, expenses, and interest.

118. In all, the Arbitrator awarded KENMAR the amount of $3,170,210.00 for the SPA Transaction and $543,636.00 for the December 18, 2023 Transaction, along with interest, costs, expenses, and attorney's fees amounting to over $5,000,000 as of the date of this petition.

**Defendants wrongfully used their domination over
NEDETEL to hinder and delay payment to KENMAR.**

119.    By letter dated June 18, 2024 KENMAR, through counsel, demanded payment of the amounts set forth in the Partial Final Award.

120.    By letter dated August 6, 2024, KENMAR, through counsel, demanded payment of the amounts set forth in the Final Award.

121.    As of the date of this Complaint, NEDETEL has wrongfully refused to satisfy the Final Award.

122.    During an August 1, 2024 telephone conversation between Mr. Polizzi of Kenmar and Mr. Alvaro de Pablo of UFINET Latam, Mr. de Pablo stated, in sum and substance, that nothing would not be paid unless and until KENMAR obtained judicial confirmation of the Final Award against NEDETEL.

123.    On September 5, 2024, KENMAR commenced an action to confirm the Final Award.

124.    NEDETEL submitted papers in response to the action to confirm, but failed to dispute the findings of fact in the Final Award and failed to assert any grounds to vacate or modify the Final Award, except with respect to post-judgment interest.

125.    The Final Award was confirmed, and judgment entered, on December 19, 2024.

126.    Despite judicial confirmation of the Final Award, NEDETEL has wrongfully refused to pay.

127.    On information and belief, Defendants are engaging in a strategy to hinder and delay payment of the Final Award by insisting that the Final Award be judicially confirmed in the courts of the United States and Ecuador while UFINET Latam transfers cash and other liquid assets out of NEDETEL.

128.    On information and belief, the process of confirming and enforcing the Final Award in the courts of Ecuador will be lengthy, burdensome, costly, and subject to judicial fraud and corruption. *See, e.g.*, *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 558-61 (S.D.N.Y. 2014), *aff'd,* 833 F.3d 74 (2d Cir. 2016).

129.    On information and belief, Defendants exercise complete domination over NEDETEL by their control over its Board of Directors, control over the day-to-day operation and management of NEDETEL, and control over the transfer of cash and liquid assets from NEDETEL to UFINET Latam or its global affiliates.

130.    On information and belief, the Defendants wrongfully have used and are continuing to use their domination and control over NEDETEL to hinder and delay payment of the Final Award and otherwise to defraud KENMAR, a judgment creditor of NEDETEL.

## <u>COUNT I</u>
### <u>(LIABILITY AS AGAINST ALL DEFENDANTS)</u>

**The Final Award should be enforced against Defendants
jointly and severally under the theory of assumption of liability.**

131.    Plaintiff repeats and realleges each and every factual allegation contained in paragraphs 1-130.

132.    The United States is a signatory to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York

Convention"), which has been codified at Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201 et seq.

133. The New York Convention applies to the Final Award, which was issued by the ICDR in the United States. The United States, Ecuador, and Spain are contracting states to the New York Convention.

134. The Final Award was obtained pursuant to the Advisory Agreement, which is a signed writing containing the arbitration provision agreed to by KENMAR and NEDETEL.

135. The Final Award was issued in favor of KENMAR against NEDETEL.

136. The New York Convention and FAA permit the enforcement of a foreign arbitral award in the United States against an award-debtor's successors-in-interest.

137. Successor liability may be found where a purchaser assumes the liability of the seller.

138. In Section 11.5 the SPA, the Defendants agreed as follows:

> 11.5. Bankers' and Advisors' Fee Agreement.
>
> The Sellers *and the Purchaser* shall be obligated to assume and pay all unpaid fees, expenses, costs, etc. in connection with their respective engagements of bankers, brokers, financial advisors or any type of agreements under the Transaction, and in no event shall the Company [NEDETEL] be obligated to bear the fees or expenses of the Parties to the Transaction.

(emphasis added)

139. The amounts awarded in the Final Award constitute "unpaid fees, expenses, costs" assumed by the "Sellers and the Purchaser."

140. By way of the foregoing, the Defendants are jointly and severally liable with NEDETEL for the amounts awarded in the Final Award.

25

<u>**COUNT II**</u>
<u>**(LIABILITY AS AGAINST UFINET LATAM)**</u>

**The Final Award should be enforced against UFINET Latam
under the doctrine of successor liability**

**A. UFINET Latam is liable under a theory of fraudulent conveyance.**

141. Plaintiff repeats and realleges each and every factual allegation contained in paragraphs 1-140.

142. The New York Convention and FAA permit the enforcement of a foreign arbitral award in the United States against an award-debtor's alter egos and successors-in-interest. *See CBF Industria de Gusa S/A v. AMCI Holdings, Inc.,* 316 F. Supp. 3d 635, 646-650 (S.D.N.Y. 2018).

143. In a merger and acquisition, successor liability may be imposed on a purchasing corporation where a conveyance was made with actual intent to hinder, delay, or defraud creditors. *Tommy Lee Handbags Mfg. Ltd. v 1948 Corp.,* 971 F Supp 2d 368, 380 (S.D.N.Y. 2013).

144. Here, UFINET Latam, because of its relationship and communications with CINVEN, knew or should have known that KENMAR had been retained as advisor to NEDETEL for a purchase and sale of the Individual Defendants' equity in NEDETEL.

145. Given its prior knowledge of KENMAR's representation of NEDETEL, UFINET Latam knew or should have known that KENMAR was entitled to the payment of a fee upon a closing of the purchase and sale of the Individual Defendants' equity NEDETEL.

146. Despite UFINET Latam's prior knowledge of KENMAR's representation of NEDETEL, UFINET Latam engaged in secret discussions with the Individual Defendants' regarding the purchase and sale of the Individual Defendants' equity NEDETEL.

147. Despite its prior knowledge, UFINET Latam proceeded to purchase 70% of the equity of NEDETEL and conveyed valuable consideration to the Individual Defendants without making provision for the payment of the Success Fee to KENMAR due as a result of that sale.

148. The conveyance by UFINET Latam of valuable consideration to the Individual Defendants without withholding a reserve for payment of amounts due KENMAR constituted a transaction to defraud KENMAR.

149. No later than November 2021, UFINET Latam knew, by way of the demands made by KENMAR, of the substance of KENMAR's claim for payment of a Success Fee.

150. The Partial Final Award and Final Award became binding upon NEDETEL on the dates those awards were issued. *See Iraq Telecom Ltd. v. IBL Bank S.A.L.*, 597 F. Supp. 3d 657, 665 (S.D.N.Y. 2022), *aff'd,* No. 22-832, 2023 WL 2961739 (2d Cir. Apr. 17, 2023), citing *Compania de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1298 (10th Cir. 2020).

151. Notwithstanding the binding nature of the awards, UFINET Latam acted with the intent of hindering and delaying payment by using its domination over NEDETEL to cause it to refuse to pay the relief granted in the Final Award.

152.   Despite its knowledge of NEDETEL's legal obligation to KENMAR, UFINET Latam, is using its domination and control over NEDETEL to hinder and delay payment while transferring approximately $10,000,000 in cash and/or liquid assets out of NEDETEL.

153.   The transfer of NEDETEL's cash or liquid assets to UFINET Latam and/or its global affiliates constitutes a fraudulent conveyance as against KENMAR.

154.   KENMAR is entitled to judgment finding UFINET Latam jointly and severally liable with NEDETEL for the relief awarded to KENMAR in the Final Award.

## B. UFINET Latam is liable under a theory of de facto merger.

155.   Under the doctrine of de facto merger, "a successor that effectively takes over a company in its entirety should carry the predecessor's liabilities as a concomitant to the benefits it derives from the good will purchased." *Fitzgerald v. Fahnestock & Co.*, 286 A.D.2d 573, 574-5 (N.Y. App. Div. 1st Dep't 2001) (citations omitted).

156.   "The four 'hallmarks' of de facto merger under New York law include: (1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the successor of liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets and general business operation." *MBIA Ins. Corp., Inc.*, 40 Misc. 3d at 657 quoting *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 46 (2d Cir. 2003).

28

157.    "A finding of de facto merger does not 'necessarily require' the presence of each factor." *MBIA Ins. Corp.*, 40 Misc. 3d at 657 citing *Van Nocker v. A.W. Chesterton Co.*, 15 A.D.3d 254, 256 (N.Y. App. Div. 1st Dep't 2005) (citing *Fitzgerald*, 286 A.D.2d at 574).

158.    The "'factors are analyzed in a flexible manner that disregards mere questions of form and asks whether, in substance, it was the intent of the successor to absorb and continue the operation of the predecessor.'" *MBIA Ins. Corp.*, 40 Misc. 3d at 657 citing *AT & S Transp., LLC v. Odyssey Logistics & Tech. Corp.*, 22 A.D.3d 750, 752 (N.Y. App. Div. 2005).

### *(i)*    Continuity of Ownership

159.    "Under New York law, continuity of ownership 'describes a situation where the parties to a transaction become owners together of what formerly belonged to each.'" *MBIA Ins. Corp.*, 40 Misc. 3d at 657 quoting *Van Nocker*, 15 A.D.3d at 256.

160.    Here, by way of the SPA, the Shareholders' Agreement, the Put/Call Option Agreement and related, other agreements (the "Other Agreements")[7] entered into among the Defendants and NEDETEL:

a.    On or about October 1, 2021, UFINET Latam acquired 70% of the equity of NEDETEL;

b.    On or about September 5, 2022, the Individual Defendants acquired 28.67% of the equity of the Pre-existing UFINET Affiliates;

---

[7] In connection with the SPA, the Respondents entered into a number of "side letter" agreements relating to the effectuation of the terms of the SPA. Respondents also entered into a separate Stock Purchase Agreement by which the Individual Respondents were granted a 28.67% interest in the Pre-Existing UFINET Affiliates.

c.      On or about December 1, 2022, the Pre-existing UFINET Affiliates were merged into NEDETEL;

161.    Accordingly, UFINET Latam and the Individual Defendants "become owners together of what formerly belonged to each.'" *MBIA Ins. Corp.*, 40 Misc. 3d at 657 quoting *Van Nocker,* 15 A.D.3d at 256.

### (ii)  Cessation of Ordinary Business

162.    "The second hallmark of de facto merger under New York law is 'cessation of ordinary business operations and the dissolution of the selling corporation as soon as possible after the transaction.'" *MBIA Ins. Corp.*, 40 Misc. 3d at 662 quoting *Van Nocker,* 15 A.D.3d at 256.

163.    "The dissolution criterion 'may be satisfied, notwithstanding the selling corporation's continued formal existence, if that entity is shorn of its assets and has become, in essence, a shell.'" *MBIA Ins. Corp.*, 40 Misc. 3d at 662 quoting *Van Nocker,* 15 A.D.3d at 256. This may occur where an acquired company continues operations but is so "control[led]" that it is incapable of "operating independently of" the acquiror. *MBIA Ins. Corp.*, 40 Misc. 3d at 664.

164.    Here, by way of the SPA, the Shareholders' Agreement, the Put/Call Option Agreement and the Other Agreements entered into between the Defendants and NEDETEL:

a.      UFINET Latam assumed control over the board of directors of NEDETEL by appointing and controlling 3 out of 4 members of the board;

b.      UFINET Latam executives assumed control over NEDETEL's management and operations;

c.      NEDETEL's confidential information and market knowledge was transferred to UFINET Latam or its global affiliates;

d.      UFINET Latam obtained the power to transfer cash and/or liquid assets from NEDETEL to UFINET Latam or its global affiliates; and

e.      UFINET Latam imposed on NEDETEL a loan obligation providing for, on information and belief, certain ongoing covenants and obligations owed to UFINET Latam.

165.    By way of the foregoing, UFINET Latam exercises such "control[]" that NEDETEL is incapable of "operating independently of" UFINET Latam. *MBIA Ins. Corp.*, 40 Misc. 3d at 664.

### (iii) Continuity of Management, Personnel, Physical Location, Assets and General Business Operation.

166.    By way of the SPA, the Shareholders' Agreement, the Put/Call Option Agreement, and the Other Agreements entered into between the Defendants and NEDETEL:

a.      The "Commercial Manager" of the Pre-Existing UFINET Affiliates assumed day-to-day control over the post-merger NEDETEL, including control over employees, pricing, policies, and strategy;

b.      J. Menéndez became a "Commercial Advisor" to NEDETEL and worked with the Commercial Manager from the Pre-Existing UFINET Affiliates; and

c. The Individual Defendants retained certain veto rights over the payment of pre-closing liabilities pursuant to the SPA.

167. By way of the foregoing, there is a continuity of management.

**(iv) Assumption of Liabilities Ordinarily Required to Continue Operations.**

168. "The final of the de facto merger hallmarks requires 'assumption by the successor of liabilities ordinarily necessary for continuation of the predecessor's business.' There are few New York state cases defining the precise contours of this test; however, New York courts have looked to whether the buyer assumed the seller's existing contracts, royalty obligations, or outstanding debts." *MBIA Ins. Corp.*, 40 Misc. 3d at 671–72 quoting *Miller v. Forge Mench P'ship Ltd.*, No. 00 CIV. 4314 (MBM), 2005 WL 267551, at *9 (S.D.N.Y. Feb. 2, 2005)

169. Here, before the SPA Transaction with UFINET Latam, NEDETEL had commenced the development of a data center in Guayaquil, which was a substantial part of NEDETEL's plan for growth.

170. In connection with and following the SPA Transaction, UFINET Latam assumed substantially all of the financial obligations arising from the contracts and debts concerning the data center.

171. In addition, by way of the SPA, the Defendants jointly and severally assumed pre-closing liabilities relating to the costs of advisors and bankers.

172. Thus, Defendants are jointly and severally liable with NEDETEL for payment of the Final Award due to KENMAR.

## COUNT III
## (LIABILITY AS AGAINST THE INDIVIDUAL DEFENDANTS)

### The Final Award should be enforced against the Individual Defendants under the theory of fraudulent conveyance.

173. Plaintiff repeats and realleges each and every factual allegation contained in paragraphs 1-172.

174. The "corporate form may be pierced" to hold non-signatories liable for relief awarded in an arbitration award "where '(1) the owner has exercised such control that the corporation has become a mere instrumentality of the owner, which is the real actor; (2) such control has been used to commit a fraud or other wrong; and (3) the fraud or wrong results in an unjust loss or injury to plaintiff.'" *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 316 F. Supp. 3d 635, 646 (S.D.N.Y. 2018).

175. "Courts consider a variety of factors" in determining whether to pierce the corporate veil and impose liability "when doing so would achieve an equitable result." *CBF Industria de Gusa S/A*, 316 F. Supp. 3d at 646.

176. Here, liability should be imposed on the Individual Defendants because they used their pre-merger control over NEDETEL to engage KENMAR for the specific purpose of using KENMAR's status as a New York-based international investment bank to open a channel of communication with UFINET Latam's majority owner, CINVEN, that was otherwise unavailable to the Individual Defendants.

177. On the same day that KENMAR's efforts with CINVEN resulted in an expression of interest from UFINET Latam, the Individual Defendants immediately instructed KENMAR to cease all further communications with CINVEN.

178. The Individual Defendants then used their domination and control over NEDETEL to engage in a secret sale process with UFINET Latam to the exclusion of KENMAR.

179. While the Individual Defendants kept the sale process with UFINET Latam secret from KENMAR, the Individual Defendants continued to entertain discussions with other Potential Acquirers procured by KENMAR.

180. On information and belief, the Individual Defendants used the other offers generated by KENMAR's efforts as leverage to negotiate better sale terms from UFINET Latam.

181. Within days of entering into an agreement-in-principle with UFINET Latam, the Individual Defendants caused NEDETEL to terminate the Advisory Agreement with KENMAR.

182. On information and belief, the Individual Defendants engaged in the foregoing conduct with the specific intent of depriving KENMAR of the Success Fees it was due under the Advisory Agreement.

183. By way of the foregoing, the Individual Defendants are directly liable for NEDETEL's obligations under the Final Award.

184. KENMAR is entitled to judgment finding the Individual Defendants jointly and severally liable for the relief awarded to KENMAR in the Final Award.

## COUNT IV
## (LIABILITY AS AGAINST THE INDIVIDUAL DEFENDANTS)

### The Individual Defendants are jointly and severally liable under the theory of estoppel.

185.    Plaintiff repeats and realleges each and every factual allegation contained in paragraphs 1-184.

186.    The Individual Defendants s were the two individual shareholders of the then-closely held NEDETEL.

187.    The Individual Defendants retained KENMAR on behalf of NEDETEL for the purpose of selling their equity in NEDETEL.

188.    The Individual Defendants are sufficiently "closely related" to the Advisory Agreement signed by NEDETEL to be bound by the terms of the Advisory Agreement.

189.    By way of the foregoing, the Individual Defendants are directly liable for NEDETEL's obligations under the Final Award.

190.    KENMAR is entitled to judgment finding the Individual Defendants jointly and severally liable for the relief awarded to KENMAR in the Final Award.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that Court enter Judgment granting Plaintiff the following relief:

(a)    Finding that this Court has personal jurisdiction over the Defendants;

(b)    Finding that the Defendants are liable, jointly and severally, for the relief granted to KENMAR in the Final Award;

35

**(c)**     Granting to KENMAR the amounts of (1) $3,170,210 with pre-award interest at 9 percent per annum from October 21, 2021, through June 10, 2024, and from July 10, 2024, through August 1, 2024, as well as post-award interest at 9 percent per annum from August 1, 2024 until the date this judgment is entered; (2) $543,636 with interest at 9 percent per annum from December 13, 2023, until June 10, 2024, and from July 10, 2024, through August 1, 2024, as well as post-award interest from August 1, 2024, through the date this judgment is entered; (3) $535,539.25 in attorneys' fees and costs; and (4) $149,125.50 in arbitration fees and arbitrator compensation; it is further

**(d)**     Declaring that Defendants are jointly and severally liable to KENMAR for a success fee according to the terms of Exhibit A of the Advisory Agreement (ECF No. 6-2) for any put/call option on shares that may be exercised pursuant to the put/call option agreement dated October 18, 2021, and that the success fee shall be due upon closing of the transaction for the purchase and sale of the shares being transferred.

**(e)**     Awarding Plaintiff post-judgment interest accruing at the statutory rate provided in 28 U.S.C. § 1961 from the date of entry of judgment;

**(f)**     Awarding Plaintiff costs and disbursements incurred in this proceeding; and

**(g)**     Granting Plaintiff such other and further relief as this Court deems just

and proper.

Dated:  New York, New York
       January 21, 2025

FELICELLO LAW P.C.

By:   */s/ Michael James Maloney*
    Michael James Maloney
    Rosanne E. Felicello
366 Madison Ave
3rd Floor
New York, New York 10017
(212) 584-7806
mmaloney@felicellolaw.com
rosanne@felicellolaw.com

*Attorneys for Plaintiff Kenmar Securities, LLC*

37